**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**Ingenix, Inc.,** **Civil No. 01-704 (MJD/SRN)**

**Plaintiff,**

**v.**

**ORDER**

**Symmetry Health Data Systems, Inc.,**

**Defendant.**

---

Peter M. Lancaster, Esq. and Yoav M. Griver, Esq., on behalf of Plaintiff.

Patrick A. Reinken, Esq. and Douglas C. Erickson, Esq., on behalf of Defendant.

---

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-entitled matter came before the undersigned United States Magistrate Judge on **April 9, 2002**, on Plaintiff's Renewed Motion to Compel Production of Financial Documents, to Compel Discovery Regarding Opinions of Counsel, and to Re-Depose Dennis Dang (Doc. No. 42); Defendant's Motion for Extension of Discovery to 8/2/02 to Take Additional Depositions (Doc. No. 46); Defendant's Motion for Expedited Consideration of Motion for Leave to Extend Discovery (Doc. No. 48); Defendant's Motion to Bifurcate (Doc. No. 54); and Defendant's Motion for Expedited Consideration of Motion to Bifurcate (Doc. No. 59), and on **April 16, 2002**, on Defendant's Motion to Compel Discovery (Doc. No. 50).

This Order addresses those motions.

## I. PLAINTIFF'S MOTION TO COMPEL

Rule 26(b)(1) of the Federal Rules of Civil Procedure permits discovery of any matter

APR 24 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

"relevant to the subject matter involved in the pending action" if it would either be admissible as evidence at trial or if it "appears reasonably calculated to lead to the discovery of admissible evidence." The standard of relevance in the context of discovery is broader than in the context of admissibility. Hofer v. Mack Trucks, Inc., 981 F.2d 377, 380 (8th Cir. 1992); Fed. R. Civ. P. 26(b) (inadmissibility is not grounds for objection to discovery). A threshold showing of relevance must be made before discovery is allowed, Onwuka v. Federal Express Corp., 178 F.R.D. 508, 516 (D. Minn. 1997), but the Court has broad discretion in fashioning an appropriate remedy to resolve disagreements over the production of the requested information. Cook v. Kartridg Pak Co., 840 F.2d 602, 604 (8th Cir. 1988). There is no black letter rule on discoverability, rather "courts have undertaken a fact specific determination of the extent of the similarities or dissimilarities, and have inquired about the basis for the discovery request." Hofer, 981 F.2d at 380-81.

**A. Financial Documents.**

Plaintiff seeks all documents relevant to Defendant's profitability from January 1, 2000 through the present. Specifically, Plaintiff requests Defendant's balance sheets, ledgers, bank statements, tax returns, tax schedules and worksheets, accounting work papers, and other accounting records. Plaintiff states that, to date, Defendant has only produced profit and loss statements from the years 2000 and 20001, and royalty reports. Plaintiff asserts that "many of the entries on the 2000 P&L Statement are not understandable on their face, and no audited financials or other accounting records respecting the entries have been produced by Symmetry that would enable Ingenix to test the accuracy of the P&L statement." Plaintiff emphasizes that it has no other source for this information. It adds that because there is already a protective order in

place in this case, only Plaintiff's counsel will have access to this information, not Plaintiff itself. Hence, production will not harm Defendant's competitive position.

Plaintiff also requests the tax returns of Defendant's two principals, Mitch Portnoy and Dennis Dang. Plaintiff explains that Portnoy and Dang are treating Symmetry as a Subchapter S corporation, and it is impossible to determine whether any profits or costs are being hidden solely by examining Defendant's profit and loss statement.

Defendant replies that every expense, profit, and other accounting record is accurately represented by the 2000 and 2001 profit and loss statements. Therefore, those profit and loss statements furnish Plaintiff with all the necessary information. Further, Defendant states that there is no relevant profitability information to be gained from Portnoy and Dang's tax returns, that is not reflected in Symmetry's own tax returns.

The Court grants Plaintiff's motion with respect to financial documents. The information Plaintiff seeks is necessary to adequately determine profitability. Therefore, Plaintiff is entitled to its discovery, in order to demonstrate damages, pursuant to 35 U.S.C. § 284. Defendant has explained to the Court that the profit and loss statements are generated by a Quicken program, into which Defendant enters all of its receipts and other cost information throughout the year. The parties are instructed to discuss what information the Quicken program could make available as support for the profit and loss statements. In addition, the parties are to discuss whether Portnoy and Dang's tax returns would reveal any relevant financial information that is not already reflected in the corporation's tax returns. If not, those returns need not be produced. If so, at least those portions of the returns which reveal relevant financial information should be produced. Finally, Defendant is instructed to produce all relevant balance sheets and bank

statements. The current protective order ensures that Plaintiff itself will not have access to this information. Therefore, the production will not prejudice Defendant, and no in camera review is necessary prior to production.

**B. Discovery Regarding Opinions of Counsel.**

Plaintiff requests that the Court order Defendant to produce: (1) all documents related to any infringement, validity, or enforceability opinions or advice that Defendant has obtained from counsel; and (2) make available for deposition any employee or counsel involved in the preparation, provision, or communication of such oral or written opinions or advice. Plaintiff contends that Defendant has improperly withheld opinion documents and information which it placed in issue in the present case. Plaintiff states that while Defendant claims to have relied on the written opinion of David Rosenbaum, contained in a letter dated February 15, 2002, this fact was not revealed until after Plaintiff had taken the depositions of most of Defendant's personnel. Further, Plaintiff asserts that Rosenbaum is participating with Defendant's trial counsel, and not simply acting as patent counsel. Therefore, Defendant has waived any privilege with respect to all of its trial counsel's documents.

Defendant responds that Rosenbaum's opinion is the only one upon which it relied. Defendant's trial counsel represents to the Court that no member of their firm provided an opinion with respect to patent infringement, validity, or any other patent matter. Moreover, they state they are not qualified to provide any such opinion. Further, Rosenbaum did not rely on any of their opinions when formulating his own opinion. Hence, Defendant will not claim to have relied on their opinions as part of its willfulness defense. Therefore, Defendant concludes that there is no basis for invading trial counsel's privilege.

The Court denies Plaintiff's motion with respect to the discovery of trial counsel's documents. At this point, there is nothing to indicate that there is anything in the possession of trial counsel that is discoverable, and it would be inappropriate to invade trial counsel's privilege. The Court recognizes, however, that Plaintiff is entitled to Rosenbaum's opinion and any documents upon which he relied to produce his opinion. If, after deposing Rosenbaum, Plaintiff believes there is still relevant discovery being withheld, it is instructed to return to the Court with additional evidence to support that claim.

### C. Re-Deposing Dennis Dang.

Defendant has agreed that Dennis Dang's deposition should be completed. Therefore, the Court denies Plaintiff's motion as moot, with respect to this request.

As a final matter, the Court denies Defendant's request for an award of costs and fees incurred in defending against this motion.

## II. DEFENDANT'S MOTION TO BIFURCATE

> The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment of the Constitution or as given by a statute of the United States.

Fed. R. Civ. P. 42(b). In patent cases, the Court applies the law of the Federal Circuit rather than that of the regional circuit in which the case arose. See Multi-Tech Systems, Inc. v. Vocaltec Communications, Inc., 122 F.Supp.2d 1046, 1049 (D. Minn. 2000); Akro Corp. v. Luker, 45 F.3d 1541, 1543 (Fed. Cir. 1995); Beverly Hills Fan Co. v. Royal Sovereign Corp. 21 F.3d 1558, 1564 (Fed. Cir. 1994), cert. dismissed, 512 U.S. 1273 (1994).

> An accused infringer, therefore, should not, without the trial court's careful consideration, be forced to choose between waiving the privilege in order to protect itself from a willfulness finding, in which case it may risk prejudicing itself on the question of liability, and maintaining the privilege, in which case it may risk being found to be a willful infringer if liability is found. Trial courts should give serious consideration to a separate trial on willfulness whenever the particular attorney-client communications, once inspected by the court *in camera*, reveal that the defendant is indeed confronted with this dilemma. While our court has recognized that refusal of a separate trial will not require reversal in every case involving attorney client communication bearing on willfulness, we have suggested the advisability of separate trials in appropriate cases.

Quantum Corp. v. Tandon Corp., 940 F.2d 642, 644 (Fed. Cir. 1991).

Defendant asserts that the Court should bifurcate the issues of infringement and willfulness. It states that "if and only if Ingenix can show infringement should there be any discovery concerning willfulness and the 'opinion of counsel.'" Defendant explains that if the issues are not bifurcated, it will be forced to waive attorney-client privilege, with respect to its patent counsel's opinion, before any judgment is reached concerning infringement. To avoid such prejudice, Defendant concludes the issues should be bifurcated. Defendant cites Quantum, 940 F.2d at 644 in support of its conclusion. Defendant also emphasizes that there is only one patent opinion on which it will rely for its willfulness defense. Therefore, bifurcation will not waste judicial resources or unduly delay resolution of the present case, if it becomes necessary to try the willfulness issue.

Plaintiff responds that bifurcation is not appropriate in the present case. Plaintiff argues that bifurcation would require extending the current deadlines in the Court's Pretrial Scheduling Order, and that Defendant lacks good cause for extending these deadlines. Further, Plaintiff explains that bifurcation is the exception, rather than the rule, and that Quantum is not a basis for

bifurcation in the present case. Plaintiff states that Defendant's reliance on an opinion of counsel is a standard defense in patent infringement cases, and there are no exceptional conditions to justify bifurcation. Moreover, the waiver of attorney-client privilege that accompanies a reliance on counsel defense should not constitute prejudice in the present case.

Plaintiff adds that the Amended Pretrial Scheduling Order provided that the case should not be divided into separate liability and damages phases. As a result, the parties have already conducted discovery in anticipation of a single trial. Hence, "to bifurcate discovery and trial now would, even more than usual, unfairly complicate and increase the burdens upon the parties and the court."

The Court denies Defendant's motion to bifurcate. The reasoning in Quantum does not require bifurcation in the present situation. Defendant has not submitted any documents to the Court to demonstrate that it is confronted with the Quantum dilemma. Defendant's trial counsel has represented to the Court that it was entirely uninvolved in any patent opinion upon which Defendant might rely, in making a wilfulness defense. Therefore, the potential prejudice to Defendant is greatly reduced. Defendant will only be forced to waive attorney-client privilege with respect to its patent counsel's documents. When approaching the Quantum dilemma, one court reasoned as follows:

> This may be one reason why parties choose not to have the same counsel given an opinion letter on the issue of infringement and later defend them at the infringement trial. Bunn-O-Matic has chosen to have the same counsel for both, which is its choice. However, Defendant should not foist the consequences of its decision on the Court or its opposing party.

Real v. Bunn-O-Matic Corp., 195 F.R.D. 618, 626 (N.D. Ill. 2000). Fortunately, in the present case, Defendant has chosen separate counsel for the two tasks. Thus, it does not risk prejudicing

itself on the issue of liability, if it waives privilege concerning the patent opinion. In the absence of that prejudice, the Court finds no justification for bifurcating infringement and wilfulness. If infringement is found, the wilfulness issue will be a relatively straightforward one. Defendant only claims to have relied on one opinion of counsel. Absent significant prejudice, that issue alone can not justify the time and expense to the parties and the Court of having an entirely separate trial.

## III. DEFENDANT'S MOTION FOR EXTENSION OF DISCOVERY TO 8/2/02 TO TAKE ADDITIONAL DEPOSITIONS.

Defendant requests that the discovery cutoff date be postponed 60 days from June 3, 2002, to August 2, 2002. Defendant states that although the Court originally permitted each party to take 23 depositions (20 fact witnesses and 3 experts), it must depose 14 additional fact witnesses, raising its total to 37. The individuals Defendant requests to depose include nine inventors, two original patent counsel, a patent agent, a patent representative, a programmer, and certain individuals Defendant states anticipated infringement and licensing.

Defendant also explains that it needs additional time, because Plaintiff failed to adequately identify the 10,019 pages of documents it produced. In addition, Plaintiff has failed to retrieve several years' worth of back-up tapes. Defendant also states that witnesses who were instructed not to answer questions during depositions because of the Arizona stay must be redeposed, because the instructions were in error. Further, witnesses who were instructed not to answer questions concerning embodiments of the patent in question must be redeposed.

Plaintiff responds that Defendant's motion should be denied. Plaintiff contends that Defendant has wasted time deposing individuals who obviously have no relevant information to provide. Further, it is not necessary to depose all of the inventors, as many of them will simply

supply identical information. Plaintiff states that all of the documents it produced were supplied in the order in which they were kept in the ordinary course of business, and it has also already volunteered to identify any specific documents Defendant brings to its attention. Plaintiff argues that it only instructed witnesses not to answer questions occasionally in depositions, and only did so when the questions violated the Arizona Stay. Plaintiff states that the embodiment of the patent is irrelevant for infringement purposes, and such discovery can not justify extending the Pretrial Scheduling Order. Plaintiff adds that it has spent $20,000 recovering information from the back-up tapes, and Plaintiff has arranged for the information to be reviewed to determine if it is responsive to any of Defendant's discovery requests.

The Court grants Defendant's motion with respect to the extension of time, and grants, in part, Defendant's motion with respect to taking additional depositions. A Second Amended Scheduling Order will follow, extending the discovery completion date from June 3, 2002 to August 2, 2002, and also extending all subsequent deadlines. As will be explained below, when addressing Defendant's motion to Compel, Defendant is entitled to better identification of the documents that Plaintiff has produced. It will also be entitled to ask additional questions to Plaintiff's patent attorney, and one of the inventors listed on both the '514 and '164 patents.

The Court will also permit Defendant to take eight, rather than 14, additional depositions. To date, Defendant has taken eleven depositions, and a Rule 30(b)(6) deposition. Defendant has identified 19 proposed deponents, and Plaintiff has represented to the court that it currently does not intend to call any of these witnesses at trial. After reviewing the list of proposed deponents, the Court finds that some of these individuals likely possess relevant information, but much of it might be cumulative. However, if, at the conclusion of these eight additional depositions, good

cause can be shown for further depositions, the Court will entertain such a motion.

As a final note, no further extensions of time will be granted in this case.

## IV. DEFENDANT'S MOTION TO COMPEL

### A. Identification of Documents.

"A party who produces documents for inspection shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request." Fed. R. Civ. P. 34(b).

Defendant states that while Plaintiff has produced over 10,000 pages of documents, it has not sufficiently labeled any of the documents. Defendant explains that Plaintiff has not indicated whether the documents are being produced as part of its Rule 26(a) disclosures, or instead are being produced in response to particular document requests. Further, Defendant states that the documents are also not being produced as kept in the usual course of business. Defendant explains that Plaintiff is combining documents from different files and locations. Further, Plaintiff has produced to Defendant some of the same documents that Defendant previously produced to Plaintiff. These documents contain a confidentiality stamp, pursuant to the current protective order in this case. Because the protective order does not permit Plaintiff itself to have access to these documents, Defendant concludes that many of these documents were not being kept in the usual course of business. Defendant concludes,

> In order for Symmetry to competently review the voluminous documents produced by Ingenix, it is critical that Ingenix organize or identify documents as mandated by the Federal Rules. Pursuant to Rule 37, Symmetry requests that this Court order Ingenix to comply with Rule 34, and compel Ingenix to provide an explanation of how the documents it has produced were kept in the usual course of business or to identify by number or category the requests for production to which each document is responsive.

Plaintiff responds that it has produced all documents as kept in the usual course of business. Plaintiff concedes that many of the documents are not labeled, or not organized well. It explains, however, that it bought 25 companies in the past three years, and many of these companies had no in-house counsel, and failed to maintain documents in an organized manner. In many instances, the files Plaintiff retrieved from these companies' storage facilities were actually the combined files of many individuals. Therefore, Plaintiff itself can not accurately label the documents or attest to their source.

The Court denies Defendant's motion without prejudice with respect to document production. On the one hand, Plaintiff can not justify its disorganized production simply by stating the companies it bought were also disorganized. However, there are currently 97 outstanding document requests, and it would be unreasonable to require Plaintiff to review the thousand of pages of documents in order to identify to which request each is responsive. Plaintiff maintains a computer database by which it organizes all of the documents currently at issue, and which could aid Defendant in identifying what has been produced. Therefore, the parties are instructed to meet and confer to determine how to proceed. The Court suggests one of the following methods: (1) Plaintiff will produce to Defendant the relevant objective fields in its database by which it organized the documents, thereby providing Defendant with the same information Plaintiff currently has; (2) Defendant will identify specific documents that are particularly important, and require Plaintiff to identify the source for those documents, and to which requests they are responsive; or (3) Defendant will identify particular document requests that it considers essential, and Plaintiff will review all of the documents and identify which are responsive to those requests. If the parties are unable to reach a solution during their meet and

confer, Defendant is free to bring a renewed motion to compel.

B. **Privilege Log.**

Defendant states that Plaintiff's current privilege log is incomplete. Defendant explains that Plaintiff redacted certain journal entries by Jerry Lutgen and entire passages from at least two documents, but failed to indicate in the privilege log that it did so.

Plaintiff responds that it has produced an updated privilege log which includes the redactions to the Lutgen journal. Plaintiff admits that there is one remaining document that it intended to reproduce in whole with a confidentiality designation, but that it incorrectly redacted instead.

As a result of Plaintiff's representation, the Court denies Defendant's motion as moot with respect to the privilege log.

C. **Product Development.**

Federal Rule of Civil Procedure 26(b)(1) provides:

> In General. Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party . . . The information sought need not be admissible at the trial if the information appears reasonably calculated to lead to the discovery of admissible evidence.

The Eighth Circuit has considered the breadth of Rule 26 and the possible abuses discovery requests which can result from it.

> Rule 26(b) of the Federal Rules of Civil Procedure is widely recognized as a discovery rule which is liberal in scope and interpretation, extending to those matters which are relevant and reasonably calculated to lead to the discovery of admissible evidence. *Kramer v. Boeing Co.*, 126 F.R.D. 690, 692 (D. Minn. 1989) (and cases cited therein). While the standard of relevance in

> the context of discovery is broader than in the context of admissibility (Rule 26(b) clearly states that inadmissibility is no grounds for objection to discovery), *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978), *Culligan v. Yamaha Motor Corp., USA*, 110 F.R.D. 122 (S.D. N.Y. 1986), this often intoned legal tenet should not be misapplied so as to allow fishing expeditions in discovery. Some threshold showing of relevance must be made before parties are required to open wide the doors of discovery and to produce a variety of information which does not reasonably bear upon the issues in the case.

Hofer v. Mack Trucks, Inc., 981 F.2d 377 (8th Cir. 1992).

Defendant states that Plaintiff incorrectly instructed its employees and former employees not to answer questions regarding the development of products and methodology that Plaintiff claims are covered by the '164 patent. Defendant contends that the invention embodied in the '164 patent is directly at issue in the present case. Defendant concedes that when the Court renders a decision on the merits, it will not look at Plaintiff's embodiments. It argues, however, that for discovery purposes, it is still entitled to inquire into the invention process. Because the original patent was expressly written to embody certain products, Defendant concludes that "discovery relating to product development is inherently intertwined with the patent prosecution at issue here." Defendant makes the same argument with respect to product development leading up to the 1998 amendment, because that amendment "significantly reworked and modified the application, canceled the existing claims, and added fourteen new claims, all of which dramatically changed what the inventors originally had claimed to have invented." Defendant summarizes that because the product development so closely paralleled the patent application process, "learning about the invention comes just as much from discovery about development of the product as from discovery about the patent prosecution *per se*."

Defendant also argues that the discovery it seeks is relevant to its defense that Plaintiff

wrongly incorporated Defendant's proprietary information into its patent. Defendant explains, "the methodology claimed in the 164 patent (which was far different than claimed before September 1998) may have been misappropriated from Symmetry. Additionally, Symmetry's ETGs may constitute prior art that should have been disclosed by Ingenix during the 164 prosecution." Defendant states that by altering the claims, Plaintiff also altered what constitutes prior art.

Plaintiff responds that the '164 patent's conception, development, refinement, and reduction to practice all occurred prior to 1994, and it has permitted discovery concerning that time period. But, according to Plaintiff, all the subsequent product development information Defendant seeks is irrelevant. Plaintiff explains that the existence of a commercial embodiment is irrelevant to a proper determination of whether Defendant infringed the '164 patent. Plaintiff cites multiple cases from the Federal Circuit holding that infringement must be determined by comparing the accused devices with the patent claims, rather than with the embodiment described in the specification. In addition, Plaintiff contends that the relevant portions of 35 U.S.C. §§ 102, 103, and 112 indicate that the use of proprietary information in the prosecution of a patent does not affect the patent's validity.

Plaintiff argues further that because the'164 patent resulted from a divisional application, any alleged breaches of the 1995 Confidentiality Agreement, are irrelevant. Specifically, Plaintiff explains that "as a matter of law, everything disclosed and claimed in the '164 Patent was already described in the 1994 Parent Application, which was filed in June 1994." Moreover, Plaintiff argues that it is entirely proper to write claims to cover competing products. As a result, Plaintiff's interest in Defendant's competing products is irrelevant to the present suit.

The Court denies Defendant's motion with respect to discovery of product development. The Court acknowledges that the standard of relevance in discovery is broader than in the context of admissibility. See e.g. Hofer, 981 F.2d at 380. But the information Defendant seeks does not appear reasonably calculated to lead to the discovery of admissible evidence. With respect to determining infringement, the Federal Circuit has cautioned that "[i]t is error for a court to compare in its infringement analysis the accused product or process with the patentee's commercial embodiment or other version of the product or process, the only proper comparison is with the claims of the patent." Zenith Lab. V. Bristol-Myers Squibb, 19 F.3d 1418, 1423 (Fed. Cir. 1994). Therefore, Plaintiff's product development and commercial embodiment will not aid in determining whether there was infringement.

In Shanklin Corp v. American Packaging Mach., Inc., 1998 WL 30691 at *4 (N.D. Ill.), the court concluded from the above principal that there was no justification for compelling discovery of a plaintiff's commercial embodiment. The court also focused on the Federal Circuit's instructions for interpreting claims, and quoted the following language:

> It is well-settled that, in interpreting the asserted claim, the court should look first to the intrinsic evidence of record, i.e., the patent itself, the specification and, if in evidence, the prosecution history.... First, we look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention.... [S]econd, it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning.... Third, the court may also consider the prosecution history of the patent, if in evidence.
>
> Extrinsic evidence is that evidence which is external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles. However, as we have recently re-emphasized, extrinsic evidence in general, and expert testimony in particular, may be used only to help the court

> come to the proper understanding of the claims; it may not be used to vary or contradict the claim language. Nor may it contradict the import of other parts of the specification. Indeed, where the patent documents are unambiguous, expert testimony regarding the meaning of a claim is entitled to no weight. Nor may the inventor's subjective intent as to claim scope, when unexpressed in the patent documents, have any effect. Such testimony cannot guide the court to a proper interpretation when the patent documents themselves do so clearly.

Shanklin 1998 WL 30691 at *4 quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582-84 (Fed. Cir.1996) (citations omitted).

Defendant does not argue that the patent documents themselves are unclear, it simply states that the extrinsic evidence it seeks is relevant for discovery. But this argument is inconsistent with Vitronics. There has been no demonstration that extrinsic evidence is required to interpret the present claims. Hence, product development and the inventors' conception are not relevant. Further, under Zenith, the details of Plaintiff's commercial embodiment itself are irrelevant. Therefore, the details of Plaintiff's commercial products will not aid in determining whether Defendant infringed the '164 patent.

In addition, Plaintiff's alleged misappropriation of Defendant's confidential information is irrelevant to the validity of the '164 patent. The Federal Circuit has explained that,

> [T]here is nothing improper, illegal or inequitable in filing a patent application for the purpose of obtaining a right to exclude a known competitor's product from the market; nor is it in any manner improper to amend or insert claims intended to cover a competitor's product the applicant's attorney has learned about during the prosecution of a patent application. Any such amendment or insertion must comply with all statutes and regulations, of course, but, if it does, its genesis in the marketplace is simply irrelevant and cannot of itself evidence deceitful intent.

Kingsdown Med. Consultants, Ltd. v. Hollister Inc., 863 F.2d 867, 874 (Fed. Cir. 1988) citing

State Indus., Inc. v. A.O. Smith Corp., 751 F.2d 1226, 1235, (Fed. Cir.1985). As a result, any facts concerning the 1995 Confidentiality Agreement are likely relevant to the Arizona suit, in which Symmetry is pursuing breach of contract and patent infringement claims against Ingenix. But they are not relevant to the present case, which concerns only the '164 patent.

While Defendant contends that Plaintiff's 1998 amendment of claims could alter what constituted prior art on a preexisting '164 patent, it offers no explanation for how this would be possible. The '164 patent resulted from a divisional application, and therefore, the subject matter of the patent could not have been altered from the original 1994 application. Further, Defendant does not explain how Plaintiff's own product development would constitute prior art, or otherwise invalidate the patent. Defendant could certainly argue that Plaintiff's claims now exceed the patent's specifications. That argument is made, however, simply by examining the language in the patent, and Plaintiff's product development is not relevant.

### D. Gorman Testimony.

#### 1. Work-Product Protection.

> Trial Preparation: Materials. Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

Fed. R. Civ. P. 26(b)(3).

"On its face, this rule applies only to documents and tangible things. However, the principles of *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), the seminal work product case, restrict an opposing party's inquiry into an attorney's mental processes, regardless of the discovery method employed. *See Shelton v. American Motors Corp.*, 805 F.2d 1323 (8th Cir.1986)." Oak Indus. v. Zenith Elec. Corp., 687 F.Supp. 369, 374 (N.D. Ill. 1988).

> Documents containing mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party, prepared in anticipation of litigation, are not denied the protection of the work product doctrine merely because the documents include technical data on which those mental impressions, conclusions, opinions, or theories are based. The work product doctrine, however, cannot be used to protect documents relating to research, tests, and experiments which are to be disclosed to the Patent Office at the time of an application for a patent since the documents do not constitute the results of an attorney's efforts to represent his client in a potentially adversary legal proceeding, but, instead, result from a legal duty to produce the total information for the Patent Office. *See Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); *Natta v. Hogan*, 392 F.2d at 693; *Natta v. Zletz*, 418 F.2d 633, 637 (7th Cir. 1969).

Burlington Indus. V. Exxon Corp., 65 F.R.D. 26, 41-42 (D. Md. 1974).

> Here, Zenith seeks discovery of McEachran's thought processes with respect to the original patent application and the later reexamination. As far as the application, we believe that any impressions or thoughts he had regarding the drafting or handling of the original application are too distant in time to be characterized as having been made "in anticipation" of litigation. *See Electronic Memories and Magnetics Corp. v. Control Data Corp.*, 20 F.R.Serv.2d (Callaghan) 700 (N.D.Ill.1975); *Hercules, Inc. v. Exxon Corp.*, 434 F.Supp. 136 (D.Del.1977). Moreover, there is no evidence suggesting that this patent application was particularly likely to result in litigation. We decline to hold, as a general rule, that an attorney's thoughts and theories regarding the preparation of a patent application are always protected by the work product privilege.

Oak Indus, 687 F.Supp. at 374.

> **2. Attorney-Client Privilege.**
>
> The Supreme Court in Upjohn left open the question of whether the scope of the attorney-client privilege extends to include communications with former, as well as current, employees. 449 U.S. at 394 n. 3, 101 S.Ct. at 684 n. 3. However, in a concurring opinion, Chief Justice Burger indicated his belief that the privilege should apply to communications by former employees: "in my view the Court should make clear now that, as a general rule, a communication is privileged at least when, as here, an employee or former employee speaks at the direction of the management with an attorney regarding conduct or proposed conduct within the scope of employment." Id. at 402-03, 101 S.Ct. at 689 (Burger, C.J., concurring).
>
> Most lower courts have followed the Chief Justice's reasoning and granted the privilege to communications between a client's counsel and the client's former employees.
>
> In light of the purpose underlying the privilege, this conclusion seems warranted. The Supreme Court has explained that the attorney-client privilege "rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out." *Trammel v. United States*, 445 U.S. 40, 51, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980). The Court reiterated this "need to know" focus in *Upjohn*: "the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." 449 U.S. at 390, 101 S.Ct. at 683.

In re Allen, 106 F.3d 582, 605-06 (4th Cir. 1997).

Defendant asserts that Alan Gorman, a patent attorney who was involved in the prosecution of the '164 patent, should be compelled to answer questions regarding his understanding of the language of the patent and the invention described by it. Defendant explains that it has no other source of information regarding the meaning of terms used in the '164 patent. In addition, "because Gorman made substantial changes to the application and

added new claims to the application, in the September 1998 Amendment, without input from many of the inventors, Gorman may well be the only single individual with information regarding the intended meaning of the terms in the 164 patent." Further, although Gorman admitted to seeing certain documents relevant to prior art, which he did not disclose to the PTO during the prosecution of the patent, he was instructed not to answer Defendant's questions concerning the materiality of those documents.

Defendant states that the information it seeks is not protected by the attorney-client privilege or work-product doctrine. Defendant maintains that the work-product doctrine concerns the forced disclosure of documents, and notes that it is not seeking production of documents. Defendant argues that the work-product doctrine generally does not cover work performed by an attorney in preparing and prosecuting a patent application. More importantly, in his deposition, Gorman stated that he did not begin performing work in anticipation of litigation until after the patent issued, a date which would be some time after November 10, 1998.

Alternatively, Defendant maintains that Gorman waived any claim of work-product protection by discussing the meaning of the patent claims with the assigned patent examiner. Moreover, during his deposition Gorman described certain components of the invention contained in the application. Defendant argues that "consistency and fairness mandate that if Gorman is going to testify regarding the materiality of some documents, that the Court compel Gorman to testify regarding the other documents of which he was aware."

Defendant further argues that the attorney-client privilege does not apply. With respect to conversations between Gorman and Plaintiff's former employees, Defendant states that the privilege does not apply because they were not Gorman's clients at the time of the conversations.

With respect to prosecuting the patent, Defendant asserts that the privilege does not apply, because he committed fraud by failing to inform the PTO of prior art documents which were material to the patent application.

Plaintiff responds that there has been no waiver of either the attorney-client privilege, or work-product doctrine. With respect to former employees, Plaintiff states that Gorman's conversations are protected by the attorney-client privilege, because they concerned matters within the scope of the inventors' past employment. In addition, Plaintiff quotes the court's statement in Cuno, Inc. v. Pall Corp., 121 F.R.D. 198, 201 (E.D. N.Y. 1988), that "[t]he cases are uniform in the patent field that where the primary purpose is securing legal advice, the privilege will be upheld despite the inclusion of technical data in the communication." Plaintiff also maintains that Gorman's conversations with Plaintiff's former employees were held in anticipation of litigation, and, thus, are protected as work product.

With respect to the patent prosecution, Plaintiff explains that Gorman was required to disclose certain information to the PTO as part of the patent application process, and such a disclosure should not constitute a waiver of privilege for any other information. Plaintiff also explains that Gorman corrected himself in his deposition, and stated that he was aware that the patent he was prosecuting might be asserted against Defendant. Hence, the patent prosecution was performed in anticipation of litigation, and is protected under the work-product doctrine. Moreover, prior to Gorman working on the '164 patent, "Medicode had petitioned the PTO for special dispatch in the prosecution of the '164 Patent application in anticipation of Symmetry's infringement of the invention claimed in that application." Thus, Plaintiff concludes, "[b]y the time Gorman assumed the prosecution of the '164 Patent application in 1998, litigation with

Symmetry based on the '164 Patent was clearly an anticipated outcome." Additionally, Plaintiff states that under Federal Circuit law, when a court interprets a patent, it gives no deference to a prosecuting attorney's subjective understanding. Therefore, Defendant has no need for the information it seeks.

Finally, Plaintiff states that the crime-fraud exception to the attorney-client privilege does not apply to Gorman's action when prosecuting the '164 patent. Plaintiff explains that Defendant has merely made an unsubstantiated claim of inequitable conduct. Moreover, Plaintiff states that the prior art documents Gorman withheld from the PTO were merely cumulative of documents he did present. Therefore, there was no violation of the PTO Rules of Practice.

The Court denies Defendants' motion with respect to Gorman's conversations with former employees. Gorman had these conversations in order to provide legal advice to Ingenix, his client. Moreover, the facts of this case suggest that Gorman was asking the inventors about worked they performed within the scope of their former employment with Plaintiff. Under the reasoning of In re Allen, these conversations should be entitled to the same privilege as conversations Gorman would have had with current employees.

The Court grants Defendant's motion with respect to questions concerning Gorman's prosecution of the patent. Defendant is not seeking communications between Gorman and Plaintiff. Instead, it is seeking information concerning Gorman's understanding of the patent, and his choice to withhold certain documents from the PTO. Therefore, this discovery does not qualify for attorney-client privilege. Plaintiff's counsel even conceded at oral argument that if there were no anticipation of litigation, then Gorman would have to reveal whether he thought the prior art in question was material.

The information also does not qualify for work-product protection. The above-mentioned authority demonstrates that an attorney's work in preparing a patent application is not automatically entitled to work-product protection, because the work alone does not indicate that it was performed in anticipation of litigation. The facts of this case demonstrate that anticipation of litigation was still a step away when Gorman was performing his work. Gorman stated during his deposition that he did not begin performing work in anticipation of litigation until after the patent issued. Gorman is an experienced attorney, who should certainly have understood the meaning and implication of the questions that were put to him regarding this subject. Thus, his subsequent explanation, when correcting his deposition, that he "mispoke" is unconvincing.

Plaintiff's argument is that its October 16, 1997 Petition to Make Special on the Grounds of Infringement to the PTO demonstrates that it believed there was already actual infringement of its patent, and the Court should infer from this fact, that all its related work was performed in anticipation of litigation. Therefore, according to Plaintiff, the anticipation of litigation was the reason Gorman was assigned to perform his work.

But that is simply not what Gorman stated. And the Court can not conclude that Gorman was performing work in anticipation of litigation, while somehow remaining unaware that he was. Further, infringement itself does not automatically lead to litigation. Frequently, a company that believes its patent is being infringed will first contact the infringing party and pursue a licensing agreement. And while lawyers will be involved in that process, it is the normal course of business, rather than litigation. Finding otherwise would expand the work-product doctrine to encompass almost all the work lawyers perform. Obviously, the alleged infringement in this case has now resulted in litigation. But that result does not retroactively

transform the status of Gorman's work into having been performed in anticipation of litigation.

With respect to explaining the claims, this is public information that was revealed to the PTO. Therefore, Defendant's motion is granted in this respect, and Defendant is permitted to ask Gorman to explain the meaning of the claim language.

**E. <u>Seare.</u>**

Dr. Seare, an inventor listed on the '514 and '164 patents, was employed by Medicode from 1990 until June 1998. In January 2001, Plaintiff's counsel, Weil, Gotshal & Manges, hired Seare as a contract consultant. In October 2001, Seare also became a contract consultant for Plaintiff. During his deposition, Plaintiff instructed Seare not to answer certain questions based on attorney-client privilege. In addition, Seare stated that he could not answer certain questions concerning the meaning of certain claims, without first reviewing the entire patent. When he was asked to review the patent before the second day of his deposition, however, Seare stated that he was unable to do so because of prior commitments.

Defendant states that it needs to understand what Seare believes the patent claims mean, and why he swore out an affidavit in 1997 stating he believed Defendant was infringing the patent. Defendant contends that Plaintiff has retained Seare simply to prevent him from testifying concerning the patent. Defendant cites <u>Nelco Corp. v. Slater Elec., Inc.</u>, 80 F.R.D. 411, 416 (E.D. N.Y. 1978) for the proposition that "in a patent infringement suit, where an inventor is retained as an expert by one of the parties, the inventor must disclose his opinions and understanding of the invention developed independent of his retention as an expert in anticipation of litigation." Defendant explains that documents Seare left at Medicode in 1998 were not compiled in anticipation of litigation. Further, they were compiled prior to Seare being

employed by Plaintiff's attorneys. Therefore, Defendant states that Seare should be compelled to fully testify regarding "his opinions, understanding, and knowledge of the 164 patent, and related infringement topics." In addition, Defendant argues that because Seare reviewed the '164 patent only days before his deposition, "he should not be allowed to stymie discovery by purported memory failure."

Plaintiff responds that Seare answered every question asked to him concerning the invention and the inventive process, including his 1997 affidavit. Plaintiff explains that Seare was only instructed not to answer questions concerning facts and opinions he developed in the course of his retention by counsel. Moreover, Plaintiff repeats that an inventor or patent attorney's opinion on proper claim construction is entitled to no deference. Therefore, according to Plaintiff, the discovery Defendant seeks is irrelevant. Plaintiff adds that Seare was entirely cooperative during his deposition, and he only refrained from answering questions: (1) concerning events in 1994 and 95 which exceeded his memory; and (2) exceeding his understanding by requiring him to read code.

The Court grants this section of Defendant's motion with respect to Seare testifying concerning the patent claims. The Court denies this section of Defendant's motion in all other respects. During the first day of his deposition, Seare was inadequately responsive to questions concerning the claims. And while Seare and Plaintiff's counsel became more cooperative in the second day of his deposition, Defendant never successfully returned to the claim language during that day. Seare's explanation that he was not sufficiently familiar with the patent to answer very basic questions concerning the claims was not persuasive. Seare is listed as an inventor on both the '514 and '164 patents, and he was employed by Medicode for nine years, during which time

those patents were developed. In addition, he should have been aware that much of his deposition would be dedicated to questions concerning those patents. Even accepting Seare's statement that he would need to review the entire patent in order to explain his understanding of the claim language, that explanation can not justify never answering Defendant's questions. The Court acknowledges that there are certain aspects of the patent which Seare does not understand, either because they involve code, or he simply had nothing to do with them. But he was obviously an active participant in a great deal of the inventing. Therefore, Seare is instructed to review the patents as necessary, and Defendant may then depose him for an additional day.

The Court denies Defendant's motion in all other respects. By the second day of his deposition, Seare answered virtually ever question put to him. He explained the basic meaning of certain language in the patent, and the invention's development, methodology, and purpose. Seare also answered questions concerning internal memoranda from this time period. In addition, he answered questions concerning what he believed his duty of disclosure was to the PTO regarding prior art. Plaintiff's counsel only instructed Seare not to answer questions which would reveal communications with counsel or at the direction of counsel. Therefore, Seare was only prevented from answering questions that called for privileged information.

**THEREFORE, IT IS HEREBY ORDERED that:**

(1) Plaintiff's Renewed Motion to Compel Production of Financial Documents, to Compel Discovery Regarding Opinions of Counsel, and to Re-Depose Dennis Dang (Doc. No. 42) is **GRANTED in part and DENIED in part** consistent with this Order;

(2) Defendant's Motion for Expedited Consideration of Motion to Bifurcate (Doc. No. 59) is **GRANTED**;

(3) Defendant's Motion to Bifurcate (Doc. No. 54) is **DENIED**;

(4) Defendant's Motion for Expedited Consideration of Motion for Leave to Extend Discovery (Doc. No. 48) is **GRANTED**;

(5) Defendant's Motion for Extension of Discovery to 8/2/02 to Take Additional Depositions (Doc. No. 46) is **GRANTED in part and DENIED in part** consistent with this Order;

(6) Defendant's Motion to Compel Discovery (Doc. No. 50) is **GRANTED in part and DENIED in part** consistent with this Order.

Dated: April 24, 2002.

Susan Richard Nelson

SUSAN RICHARD NELSON
United States Magistrate Judge